UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERRY BOWSER, Personal
Representative of the Estate of
TIANNA FIELDS, Deceased,                    Case No. 1:12-cv-3

      Plaintiff,                           HON. JANET T. NEFF

v

CALHOUN COUNTY and BARID
MUKHERJEE, M.D.,

      Defendants.

_____/

## OPINION

Plaintiff Sherry Bowser, Personal Representative of the estate of the decedent, Tianna Fields, initiated this action pursuant to 42 U.S.C. § 1983 against Defendants Calhoun County ("the County") and Barid Mukherjee, M.D. ("Dr. Mukherjee"). Now pending before the Court is Defendants' Motion for Summary Judgment (Dkt 66). Having conducted a Pre-Motion Conference in this matter and having fully considered the parties' written briefs, stipulated statements of fact and accompanying exhibits, the Court finds that the relevant facts and arguments are adequately presented in these materials and that oral argument would not aid the decisional process. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court determines that Defendants' motion is properly denied.

# I. BACKGROUND

This § 1983 case arises from the June 17, 2010 death of Tianna Fields in the Calhoun County Jail ("the jail"). On Saturday, June 12, 2010, the decedent was arrested and detained by the Calhoun County Sheriff's Department for driving with a revoked/suspended/refused license (DWLS) and for two outstanding warrants for Obstruction of Justice-Contempt of Court/Failure To Appear for Sentencing on unpaid tickets (Dkt 55, First Amend. Compl. ¶ 5). The decedent was received in the jail around 19:26 to await hearing and resolution of those charges (Dkt 67-1, Statement of Material Facts [SMF] ¶ 22). During her medical screening, the decedent reported being treated for depression, allergies to Haldol and Betadine, a painful tooth condition, blood clots in her lungs, and low iron (*id.* ¶ 24). A Medication Log similarly indicated that the decedent reported taking medications for depression, blood thinner, iron, and pain medications, although the Medication Log did not indicate the specific medications (*id.* ¶ 25). Jail staff placed the decedent in the general population area of the jail (*id.* ¶ 26).

That same day, at 21:20, Billie Trumper, RN, completed a "Jail Medical Intake Screening" (SMF ¶ 27). The screening indicated, in part, that the decedent reported using tobacco, having a cough and phlegm, and a fever of 100.3 on June 11, 2010 (*id.*). The decedent identified Methodist Medical Center in Oakridge, Tennessee ("Oakridge") as her primary care provider (*id.* ¶ 28). The decedent reported using the following medications:

1. Coumadin 2.5 mg QD prescribed 4/25/2010;
2. Klonopin (been on since 3/18), 1 mg last night for sleep;
3. Iron 3x1 day;
4. Percocet–pain pneumonia

(*id.* ¶ 29). The decedent also informed that she had a pulmonary embolism on April 19, 2010 and a blood transfusion at Oakridge on April 19, 2010 and that her last hemoglobin measurement was

8 (*id.* ¶ 30). The decedent signed the Jail Medical Intake Screening form on the same date that Trumper completed it (*id.* ¶ 31).

On Sunday, June 13, 2010, Nurse Trumper informed Dr. Mukherjee about the decedent and that the decedent was taking the blood thinner Coumadin (SMF ¶ 32). At all times relevant to this case, Dr. Mukherjee was employed as an independent contractor by Correctional Medical Services, Inc. (CMS), the organization with which the County had contracted to provide medical care to inmates at the jail (*id.* ¶ 4). Dr. Mukherjee directed nursing staff to obtain the decedent's medical records from Oakridge (*id.* ¶ 32). He also issued a telephone order for the decedent to receive a test in the morning to determine the clotting tendency of her blood and for her to be seen the morning of June 16, 2010, his next scheduled shift at the jail (*id.* ¶¶ 32, 146). Nurse Trumper completed a request for medical records form to obtain the decedent's recent medical records from Oakridge, which the decedent signed, and the records were received at the jail that same day (*id.* ¶¶ 35-36).

On Monday, June 14, 2010, the decedent pleaded guilty to the DWLS charges against her and was ordered to pay a fine and costs or spend not more than 21 days in jail in lieu of payment, with credit for time served (Dkt 55, First Amend. Compl. ¶ 6). She also pleaded guilty to the failure to appear to show cause for her unpaid tickets, and was ordered to pay fines and costs (*id.*).

That same day, the decedent provided a blood draw, and nursing staff verified the decedent's current medications (SMF ¶¶ 37-38). At 21:00, Karrie Folkert, RN, contacted Dr. Mukherjee, and Dr. Mukherjee provided a telephone order for the following medications:

1. Coumadin (anti-coagulant) 2.5 mg PO QD x 90d
2. FeS04 (Iron supplement) 325 mg PO QD x 90d
3. Colace (stool softener) 25 mg PO BID x 14d
4. Lamictal (anticonvulsant) 25 mg PO BID x 14d

(*id.* ¶ 38). Dr. Mukherjee testified at his deposition that he believed it was important for the decedent to continue her Coumadin because of her history of pulmonary embolism as he did not want her to form another blood clot (*id.* ¶ 39).

On Tuesday, June 15, 2010, nursing staff administered the decedent her first dose of Coumadin 2.5 mg and initialed the Medication Administration Record (MAR), indicating it was given during the 16:00 medication pass as ordered by Dr. Mukherjee (SMF ¶ 40). That same day, the decedent submitted a Health Services Request form, reporting pain from an "abscessed tooth or root" (*id.* ¶ 41). The request was referred to nursing staff and triaged the same day by Nurse Folkert (*id.*). Nursing staff administered the decedent 600 mg of Motrin (*id.* ¶ 42). Nurse Folkert initialed the MAR indicating that the Motrin was given during the 21:00 medication pass (*id.*).

On Wednesday, June 16, 2010, at 01:10, Nurse Folkert completed a "Nursing Protocol Documentation," indicating the decedent's chief complaint was "bottom (L) tooth abscess/gum abscess" (SMF ¶ 43). Folkert did not indicate that the decedent complained of any stomach problems (*id.*) Folkert indicated on the same form that she contacted the physician for treatment and orders and that she referred the decedent to see a dentist due to "dental pain/problem" (*id.*). However, the parties do not dispute that nursing staff apparently did not thereafter place the decedent on the referral list for examination by a dentist (*id.* ¶¶ 43, 53).

Nurse Folkert obtained a telephone order from Dr. Mukherjee for "Motrin 600 mg PO TID xl Od with meals and Amoxicillin (antibiotic) 500mg PO TID xl Od" for the decedent's tooth abscess (SMF ¶ 44). The Order was signed by Dr. Mukherjee on June 16, 2010 at 14:45 and was noted by Anita Cotton, LPN at 17:30 (*id.*). Dr. Mukherjee testified at his deposition that he believed that the amount of Motrin he ordered for the decedent—600 milligrams three times a day—was a

"conservative dose" (*id.* ¶ 45). He further stated his belief that it was appropriate for him to order Coumadin and Motrin together for a short period of time with close monitoring (*id.* ¶ 48). The decedent was administered 600 mg Motrin during the 05:00 medication pass on June 16, 2010 (*id.* ¶ 54). Nurse Folkert initialed the MAR (*id.*).

Dr. Mukherjee was present in the jail on Wednesday, June 16, 2010 for his scheduled shift (SMF ¶ 55). The June 16, 2010 sick call sheet indicates the decedent's complaint concerned her "PE Coumadin Tx. States needs blood transfusion" (*id.* ¶ 56). The sheet did not indicate any complaints by the decedent about her stomach (*id.*). Dr. Mukherjee reviewed the decedent's medical records from Oakridge, reviewed the intake forms completed by Nurse Trumper, and entered the following progress note in the decedent's medical chart:

> Tianna Fields; ID No. 54873; date 6-16-10; time 14:00 17 hours; symptoms: 30-year-old African-American female from Tennessee was booked in on 6-12-10. She stated she had pulmonary embolism in February '10 and since then she had been on Coumadin. At this time she's on 2.5 milligram daily. She also was treated for recurrent–or recent–sorry–recent infections with IV antibiotics in hospital and also for UTI, which stands for urinary tract infection. She also has history of iron deficiency anemia and takes iron pills. Her recent transesophageal echo done at the hospital was negative for vegetations. Objective: Alert, oriented times three, NAD–stands for no acute distress. I examined her heart. Normal sinus rhythm without any murmur. And there are no S3 or S4 gallops. Lungs were clear. Examined her abdomen. There is no mass, no tenderness. Bowel sounds are active. My assessment was history of anemia–pulmonary embolism–PE–anemia of iron deficiency. My plans were to continue current Coumadin dose. Repeat her PTINR. CBC with dif, which is complete blood count. Iron level, TIBC, and urinary analysis in one week. Follow up in one month.

(*id.* ¶¶ 58-59, 64).

On June 16, 2010, the decedent submitted a Health Services Request Form, indicating "my iron pills upset my stomach" (SMF ¶ 74). The request was triaged by Cindi Wellman, RN, HSA (*id.*). Dr. Mukherjee was unaware of the decedent's request (*id.*). Nursing staff administered the

5

decedent 600mg of Motrin and 2.5mg of Coumadin, and initialed the MAR indicating that the two medications were given during the 16:00 medication pass (*id.* ¶ 75).  This was the second and the last dose of Coumadin the decedent received (*id.*).  On June 16, 2010, nursing staff administered the decedent 600mg Motrin and Nurse Cotton initialed the MAR indicating that the Motrin was given during the 21:00 medication pass (*id.* ¶ 77).

The decedent also submitted a Request Form on June 16, 2010 directed to "Mental Health" (MH), reporting that she had not slept in two days and was having anxiety and bad night sweats (SMF ¶ 76).  The form indicates that MH triaged the request, and that the decedent was scheduled to be seen on June 21, 2010 by MH staff (*id.*).  There is no evidence that Dr. Mukherjee was aware of this request to MH (*id.*).

On Thursday, June 17, 2010, nursing staff administered the decedent 600mg Motrin and Barbara Burtz, RN, initialed the MAR, indicating that the Motrin was given during the 05:00 medication pass (SMF ¶ 78).  At 09:45, Nurse Wellman saw the decedent regarding her complaint that her "iron pills upset my stomach" (*id.* ¶ 79).  Wellman completed a nursing protocol form concerning "elimination," observing that the decedent's vitals were stable, her "bowel sounds [were] present," her abdomen was "non-tender," "nondistended" and "soft," and her urination was "normal and not painful" (*id.*).  Wellman's plan included advising the decedent to switch her iron pill to the evening medication pass so she would have more food in her stomach when she received her iron pill, and to purchase snacks to eat with the pill (*id.* ¶ 80).  The parties do not dispute that Dr. Mukherjee was not made aware of the decedent's complaint that her stomach was upset, nor of Nurse Wellman's plan concerning the complaint (*id.* ¶ 81).

At 11:56, an emergent/urgent incident regarding the decedent was called, and Dr. Mukherjee and additional providers responded (SMF ¶ 84). The decedent was found spitting blood from her mouth and nose, and she reported she could not breathe (*id.*). CPR was initiated, and Nurse Wellman inserted an oral airway and administered respirations with an ambu-bag (*id.*). CPR continued when the paramedics/EMS arrived, and complete care was turned over to EMS (*id.*). Dr. Mukherjee pronounced the decedent dead at 12:26 (*id.*).

An autopsy was performed the next day, and the cause of death was identified as "Massive Gastrointestinal Hemorrhage with Heterotopic Pancreas of Gastric Antrum," with Contributing factors as "Pulmonary thromboemboli, Anemia (NOS), Probable coagulopathy, and Anticoagulation therapy" (SMF ¶ 86; Dkt 66-12 at 3, Ex. K).

In April 2011, Plaintiff was appointed Personal Representative of the decedent's estate. On January 3, 2012, pursuant to 42 U.S.C. § 1983, Plaintiff filed a one-count complaint against the County and Dr. Mukherjee, in his individual and official capacity, alleging that Dr. Mukherjee's medical treatment of the decedent constituted deliberate indifference to the decedent's medical needs in violation of the Eighth Amendment (Dkt 1). The parties engaged in Voluntary Facilitative Mediation in December 2012, which was unsuccessful (Dkt 40).

In May 2013, following discovery, Defendants proposed to file a dispositive motion (Dkt 45), and this Court conducted a Pre-Motion Conference in June 2013. On June 12, 2013, the Court issued a briefing schedule, permitting the parties to brief Defendants' proposed dispositive motion (Dkt 49). That same day, however, Plaintiff moved to amend her complaint (Dkt 50), and this Court therefore suspended the briefing schedule (Dkt 52). Plaintiff did not seek to add any new claims but to expand on her § 1983 allegations, specifically, to indicate that Dr. Mukherjee was, at the critical

time, the Medical Director at the jail; that the terms and conditions of the contract between CMS and the County constitute policies under which inmates at the jail received medical treatment; that Dr. Mukherjee did not submit proper credentials, did not obtain a necessary site location physician's license for the pharmacy, and did not establish an infirmary, as required by the County's contract with CMS; and that pursuant to the contract and the deferral by the County's sheriff, Dr. Mukherjee had final decision-making authority for medical issues at the jail at all times at issue (Dkt 50 at ¶¶ 4-11). Leave to amend was subsequently granted as was time for additional discovery and a new briefing schedule (Orders, Dkts 56, 58-59). The parties filed their motion papers in April 2014 (Dkts 66-68).

The parties are scheduled to appear before the Magistrate Judge for a Settlement Conference (Dkt 69). Barring their ability to achieve a settlement, a Final Pretrial Conference is scheduled for October 20, 2014 and trial for October 28, 2014 (*id.*).

## II.  ANALYSIS

### A.  Motion Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). The party moving for summary judgment has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of an issue to be

litigated at trial. *Slusher,* 540 F.3d at 453. The ultimate inquiry is "whether the state of the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### B. Discussion

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law. *Harbin-Bey*, 420 F.3d at 575. Defendants challenge whether Plaintiff has sufficient evidence from which a reasonable trier of fact could find either Dr. Mukherjee or the County liable and whether any alleged constitutional violation by Defendants proximately caused the decedent's death. The Court will analyze the arguments in support of dismissal of either Defendant, in turn.

**1.    *Dr. Mukherjee***

"[A] prisoner's Eighth Amendment right is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The objective component of "deliberate indifference" requires the existence of a "'sufficiently serious' medical need." *Blackmore v. Kalamazoo County,* 390 F.3d 890, 895 (6th Cir. 2004). A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 897. The subjective component of "deliberate indifference" requires a plaintiff to show that "the official [knew] of and disregard[ed] an excessive risk to inmate health or safety, which is to say the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Clark-Murphy v. Foreback,* 439 F.3d

9

280, 286 (6th Cir. 2005) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)) (internal quotation marks omitted).  The official's subjective knowledge of the substantial risk can be proven 'in the usual ways, including inference from circumstantial evidence.'" *Farmer*, 511 U.S. at 842.  For example, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

Defendants argue that Plaintiff cannot establish the subjective component of a deliberate indifference claim because there is insufficient evidence from which a reasonable jury could conclude that Dr. Mukherjee was ever aware that Plaintiff had a serious medical need (Dkt 66 at 27). Defendants point out that while the decedent complained of an "upset stomach" on June 16, 2010, there is no evidence that this information was ever relayed to Dr. Mukherjee or that he became aware of such information (*id.*).  Defendants also assert that there is insufficient evidence from which a reasonable jury could conclude that Dr. Mukherjee consciously disregarded the medical needs arising from anticoagulation therapy and/or tooth pain (*id.* at 27-28).  Referencing the affidavits of their retained experts, who opine that the prescribed combination of Coumadin and Motrin was not contraindicated under the circumstances (Defs.' Exs. X-AA, Dkts 66-25, 66-26, 66-27, 66-28), Defendants argue that at best, Plaintiff's claim against Dr. Mukherjee amounts to a difference of medical opinion concerning the appropriate medical care that was required for the decedent under the circumstances; therefore, Defendants conclude that Plaintiff fails to support a cause of action for deliberate indifference under the Eighth Amendment of the Constitution (Dkt 66 at 22, 25-26, 29-30).

In response, Plaintiff accurately points out that Defendants have not contested whether the decedent demonstrated a serious medical need, the objective component of her Eighth Amendment

claim (Dkt 67 at 9). Regarding the evidence in support of the subjective component, Plaintiff argues that given the decedent's medical history, including her pulmonary embolism, record of coagulopathy, and anemia, the decedent was a "walking warning" against the combined use of Coumadin and Motrin (*id.* at 9-10). Plaintiff emphasizes that "[a]gainst this background, Mukherjee prescribed the combination of drugs, failed to discuss close monitoring with the medical staff, failed to request any nurses to be careful of stomach distress, … failed to immediately take a blood count and regularly monitor PTINR, often enough to be useful" (*id.* at 10). As for Dr. Mukherjee's asserted lack of knowledge, Plaintiff asserts that Dr. Mukherjee was not notified of the decedent's complaint about an upset stomach the night before she died because Dr. Mukherjee did not put an order in her chart instructing the nurses to immediately report any gastrointestinal problems to him (*id.* at 10). Plaintiff opines that the medical decisions "put Tianna Fields in harm's way and added up to a cascade of events that led to her bleeding and dying" (*id.* at 11).

Defendants' arguments do not entitle Dr. Mukherjee to judgment as a matter of law in his favor.

The United States Supreme Court has held that "a plaintiff need not show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.'" *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 835). Rather, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836. The Sixth Circuit Court of Appeals further instructs that "[o]ne way a prison official can act with deliberate indifference is by 'consciously exposing the patient to an excessive risk of serious harm' while providing medical treatment." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681-82 (6th Cir. 2013) (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)).

The record in this case indicates that Dr. Mukherjee was aware that the decedent was taking Coumadin when he prescribed the Motrin.  Plaintiff argues that a factfinder may conclude that Dr. Mukherjee exposed the decedent to an excessive risk of serious harm because the danger associated with ingesting both anti-coagulation medications was contraindicated and therefore "obvious" (Dkt 67 at 13).  In support, Plaintiff relies on testimony by Defendants' expert, F. Vincent Mitek, M.D., who opined that the risks associated with Coumadin were "common knowledge" and agreed, consistent with the "boxed warning" included in the prescribing information for Coumadin, that Coumadin "can cause major or fatal bleeding;" that "regular monitoring of INR in all treated patients" is required; that "[d]rugs, dietary changes, and other factors affect INR levels achieved with Coumadin therapy;" and that prescribers should "[i]nstruct patients about prevention measures to minimize risk of bleeding and to report signs and symptoms of bleeding" (Dkt 67-17 at 3-4).  Dr. Mitek further agreed with the warning that nonsteroidal anti-inflammatory drugs (NSAIDs), such as ibuprofen or Motrin, were drugs that increased the bleeding risk, such that patients receiving both NSAIDs and Coumadin should be "closely monitored" (*id.* at 4).  Dr. Mitek agreed with the prescribing information for Motrin, specifically, that the NSAID "increases the effect" of Coumadin (*id.*).  Last, Dr. Mitek agreed that physicians should be familiar with the indications and the contraindications of a drug (Pl.'s Ex. 11, Dkt 67-17 at 3-4).

Plaintiff contends that a reasonable factfinder could infer that Dr. Mukherjee was aware of the risk in prescribing both anti-coagulants but disregarded the risk not only in prescribing the two drugs but also in failing to take the necessary precautions once he prescribed the drugs.  Plaintiff's expert, Madelon K. Krissoff, M.D., opines that Dr. Mukherjee breached the medical standard of care in his treatment of the decedent's anemia in failing to timely monitor her blood count and protect

her stomach, and in failing to "refrain from giving her anything that would harm her or make that iron deficiency anemia worse" (Dkt 67-15 at 6-7). Dr. Krissoff testified that a "reasonably prudent doctor would have told the nurses and the patient to be careful of any stomach distress in the setting of giving the Motrin to a person with a history of a possible GI bleed and, certainly, iron deficiency anemia" (*id.* at 11). According to Dr. Krissoff, "a medical director of a facility needs to know what is happening in the facility" (*id.* at 12). Dr. Krissoff testified that "by ignoring somebody, ... you inadvertently do put them in harm's way" (Dkt 67-15 at 14).

Dr. Krissoff opined that the decedent died because the "Motrin given to her irritated her stomach and caused the previously present ulcer to bleed" and the "intensity of the bleeding was due to the anticoagulation effects of all those medications" (Dkt 67-16 at 3, 7). She stated that "it's all quite clear that Motrin in the setting of the Coumadin caused her to die" (*id.* at 7).

The affidavits of Defendants' experts, opining that the prescribed combination of Coumadin and Motrin was not contraindicated under the circumstances (Defs.' Exs. X-AA, Dkts 66-25, 66-26, 66-27, 66-28), fail to rebut Plaintiff's evidence that Dr. Mukherjee failed to take the necessary precautions once he prescribed the drugs, such as ensuring the close monitoring of the decedent. Moreover, the mere difference of opinion among experts does not compel summary judgment. In *Quigley,* 707 F.3d at 682, where the estate alleged that the jail death in that case was caused by a fatal drug interaction, the Sixth Circuit held that "[j]ust because certain experts disagree about whether the treatment was widely known to be dangerous does not indisputably establish that there is no consensus." The Sixth Circuit in *Quigley* concluded that a reasonable jury could find that the defendant had "consciously exposed Quigley to a substantial risk of death through his medical treatment without so much as a warning." *Id.* at 685.

13

In sum, Defendants do not challenge that Plaintiff's evidence satisfies the objective component of her Eighth Amendment claim, and the Court rejects Defendants' argument that viewing the record in the light most favorable to Plaintiff, a reasonable factfinder could not conclude that the subjective component of her claim is satisfied. Moreover, Dr. Mukherjee is not entitled to summary judgment of Plaintiff's claims against him based on Defendants' arguments about proximate cause, which remains a triable issue of fact for the jury. *See Cooper v. Cnty. of Washtenaw*, 222 F. App'x 459, 472 (6th Cir. 2007) (citing *James v. Meow Media, Inc.*, 300 F.3d 683, 692 (6th Cir. 2002)).

**2.    *The County***

A local governing body "cannot be held liable solely because it employs a tortfeasor." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). In other words, the local governing body cannot be held liable under § 1983 on a respondeat superior theory. *Id.* Rather, to properly allege a § 1983 liability claim against a local governing body, a plaintiff must adequately allege "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

In her Amended Complaint, Plaintiff alleges that Dr. Mukherjee, the Medical Director at the jail, "was the final decisionmaker with respect to medical issues at the jail, and his decisions were the policy of Calhoun County" (Dkt 55, Amend. Compl. ¶ 34). Plaintiff further alleges that the County "failed to comply with its duty to supervise the Medical Director, failed in its duty to train

its personnel, and failed to ensure that its Medical Director, Mukherjee, was competent and complied with legal and administrative requirements such as the lawful authority to operate a[n] on-site location pharmacy and to establish policies and procedures that were in compliance with the local, state, and federal regulations governing the distribution, dispensing, prescribing, administering or disposing of any controlled substance or prescribed medication affecting an inmate" (*id.*).

Defendants argue that the County is entitled to rely on the medical judgment of Dr. Mukherjee and that there is no legal authority to support Plaintiff's proposition that his decisions are the policy of the County (Dkt 66 at 31). Defendants emphasize that "[t]here is no evidence of any 'direct causal link' between an official policy of Calhoun County and the alleged constitutional violation" (Dkt 68 at 8) (emphasis in original). Defendants also contend that the jail maintained a lawful on-site pharmacy and that Dr. Mukherjee was properly licensed and registered (Dkt 66 at 31). Defendants point to evidence that Dr. Mukherjee is a trained physician who is duly licensed with the State of Michigan, is board eligible in the medical specialty of Internal Medicine, has years of experience with no history of reprimands or disciplinary action against him, and provided references upon his application for employment (*id.*). Last, Defendants argue that none of these issues amount to deliberate indifference by the County nor were they a proximate cause of the decedent's death (*id.*).

In response to Defendants' motion, Plaintiff explains that the unfettered discretion the County afforded Dr. Mukherjee meant that Dr. Mukherjee operated "untrammeled, with a structure of nurses he did not supervise" (Dkt 67 at 23). Plaintiff opines that "the ground was ripe for deliberate indifference," i.e., for Dr. Mukherjee to decide to prescribe a dangerous and risky combination of drugs without requesting the medical staff to closely monitor the decedent and

without training the medical staff about what close monitoring would entail (*id.* at 20). Plaintiff argues that the County's policies were indifferent to the decedent, a vulnerable patient, inasmuch as they caused the nurses to minimize the decedent's complaints of stomach problems, take at face value the decedent's self-diagnosis that her stomach upset was caused by the iron pills, and to refrain from immediately contacting Dr. Muhkerjee (*id.*). Plaintiff opines that although every moment was precious at that point, the head nurse at the jail did not closely monitor the decedent and did not even know she was supposed to be closely monitoring the decedent (*id.*).

Defendants' arguments do not entitle the County to judgment as a matter of law in its favor.

Plaintiff's reliance on a practice and/or custom of issuing unfettered discretion to Dr. Mukherjee does not alone establish a claim for relief under § 1983. "The fact that a particular official ... has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986). *See, e.g., Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005) (indicating that the plaintiff "conflates decisionmaking with policymaking"); *see also Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (instructing that "[d]iscretion to act is not to be confused with policymaking authority; no municipal liability results where an official merely has discretion to act because subjecting a municipality to liability in such a situation would be 'indistinguishable' from respondeat superior liability").

However, contrary to Defendants' argument, the requirement that a local governing body's wrongful actions be a "policy" is not meant to distinguish isolated incidents from general rules of conduct promulgated by local officials. *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117 (6th Cir. 1994). "If the decision to adopt that particular course of action is properly made by that

16

government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur*, 475 U.S. at 481 (holding that a decision by municipal policymakers on a single occasion may satisfy this requirement). On a single-act theory, a plaintiff must demonstrate that a "deliberate choice to follow a course of action is made from among various alternatives by the official ... responsible for establishing final policy with respect to the subject matter in question." *Burgess*, 735 F.3d at 479 (quoting *Pembaur*, 475 U.S. at 483). Moreover, that course of action must be shown to be the moving force behind or cause of the plaintiff's harm. *Id.* (citing *Pembaur*, 475 U.S. at 484-85 (finding *Monell* liability where the final decision maker ordered deputies to enter the plaintiff's medical clinic in violation of his Fourth Amendment right); *Moldowan v. City of Warren*, 578 F.3d 351, 394 & n.20 (6th Cir. 2009) (affirming denial of summary judgment on *Monell* claim where Plaintiff alleged that final policymaker directed the destruction of material evidence); *Meyers*, 14 F.3d at 1117 (finding *Monell* liability where the final policy-maker of the city ordered an investigation of the "distribution of 'unauthorized literature'" in violation of the First Amendment)).

On the facts in this record, viewed in a light most favorable to Plaintiff, a reasonable factfinder could conclude that Dr. Mukherjee, the Medical Director responsible for establishing final policy with respect to medical care of inmates at the jail, issued the orders as to the decedent's care, making deliberate treatment and supervision choices from among various alternatives. A reasonable factfinder could also conclude that Dr. Mukherjee's course of action was the moving force behind, or cause of, the decedent's death. Therefore, the County is likewise not entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim.

## III. CONCLUSION

For the foregoing reasons, the Court denies Defendants' Motion for Summary Judgment (Dkt 66).

DATED: August 15, 2014                       /s/ Janet T. Neff
                                             JANET T. NEFF
                                             United States District Judge